## BOSTON & M. R. R. v. CABANA.

### No. 4052.

Circuit Court of Appeals, First Circuit.
March 23, 1945.

Writ of Certiorari Denied June 4, 1945.
See 65 S.Ct. 1414.

Francis P. Garland and Hurlburt, Jones, Hall & Bickford, all of Boston, Mass., for appellant.

Edward S. Farmer and Brenda M. Dissel, both of Boston, Mass., for appellee.

Before MAGRUDER, MAHONEY, and WOODBURY, Circuit Judges.

MAHONEY, Circuit Judge.

This action was brought by Edward L. Cabana against the Boston and Maine Railroad to recover damages for injuries sustained while employed as a machinist's helper under the Federal Employers' Liability Act of 1908 as amended, 35 Stat. 65, 45 U.S.C.A. §§ 51–60.

The complaint alleges that on the night of August 17, 1943, the plaintiff while at work in the defendant's roundhouse was struck and injured by a locomotive backing into the roundhouse. The first count charges the defendant with negligently failing to keep the roundhouse sufficiently lighted in consequence of which the accident occurred. The second count alleges that the accident occurred in consequence of negligence on the part of the hostler backing the locomotive into the roundhouse.

On the date of the accident, the plaintiff had been working for the defendant about six months. On that day he went to work about two P. M. and was assisting a machinist named Guess in work on a locomotive on the rails of Pit 48 in the roundhouse. They were laying out shoes and wedges so that the driving box and wheels would be in alignment to the cylinders with the piston. Pit 48 is about 100 feet long; the locomotive was about 72 feet long and was headed into the roundhouse, its front end 10 to 15 feet from the front of the pit. Sometime during the evening Guess asked for another machinist to help them in making certain adjustments which required three persons. While waiting for him they worked on the locomotive, mostly "puttering around". About 8:55 P. M. they were on the right side of the locomotive near the front wheels, and Guess ordered the plaintiff to go around the engine and be in position to hold the "tran" on the left side upon the arrival of the second machinist who was expected at any moment. The plaintiff could have gone around in front of the engine, but instead he elected to walk down the right side of the pit to a plank walk across the rails near the doors at the rear opening into the yard. As he was crossing the walkway he was struck by the tender of another locomotive backing into Pit 48 from the turntable about 96 feet away. The plaintiff was able to regain his feet but was unable to stand and immediately collapsed. He was found about eight feet from the doors on the left side of Pit 48.

The plaintiff testified that there was no light on the tender and locomotive which struck him, that he heard no signal or bell,

that there were no lights at all at the rear of Pit 48 and that the only light he saw functioning was at the front of the pit. At the time of the accident this pit had 14 lighting fixtures, 7 on each side. There was evidence that several of these fixtures were out of order and in a defective condition, that the management had been advised of this and had promised to take corrective steps, and that it had failed to take any effective measures by August 17. From all the evidence offered at the trial the jury could reasonably infer that the area in which the accident occurred, both in and outside the engine house, was pitch dark.

At the close of all the evidence the defendant filed a motion for a directed verdict. The motion was denied and the case submitted to the jury. On the first count of the complaint the jury returned a verdict for the plaintiff; on the second count it returned a verdict for the defendant. From the judgment for the plaintiff on count one, the defendant has appealed on the ground that the lower court should have granted its motion for a directed verdict.

Before this court the defendant relies upon the finding of the jury with reference to the second count in the complaint that there was no negligence in the operation of the locomotive which struck the plaintiff and the dim-out regulations[1] in force at the time of the accident, and makes two contentions: first, that the defendant was guilty of no breach of duty at the time and place of injury so far as adequate lighting is concerned; and second, that the alleged insufficiency of lighting was not the proximate cause of the plaintiff's injuries.

■ The defendant contends that it was under no duty to light the area near the door at the back of the engine house where the plaintiff's work did not require him to go. Such an argument may prove too much since if the plaintiff had been working near the rear wheels the short route to the other side would have been the one he actually followed. On the facts here, however, he took the longer way around,

and the reasonableness of that is for the jury. At the most it has to do with contributory negligence on his part, and under the Act contributory negligence is not a defense and goes merely to the mitigation of damages.

■ To recover under the Federal Employers' Liability Act the plaintiff must prove that the defendant was negligent and that such negligence was the proximate cause in whole or in part of the accident. Tiller v. Atlantic Coast Line R. Co., 318 U.S. 54, 63 S.Ct. 444, 87 L.Ed. 610, 143 A. L.R. 967; Tennant v. Peoria & P. U. Ry. Co., 321 U.S. 29, 64 S.Ct. 409, 88 L.Ed. 520. "It is not the function of a court to search the record for conflicting circumstantial evidence in order to take the case away from the jury on a theory that the proof gives equal support to inconsistent and uncertain inferences. The focal point of judicial review is the reasonableness of the particular inference or conclusion drawn by the jury. It is the jury, not the court, which is the fact-finding body. It weighs the contradictory evidence and inferences, judges the credibility of witnesses, receives expert instructions, and draws the ultimate conclusion as to the facts. The very essense of this function is to select from among conflicting inferences and conclusions that which it considers most reasonable. * * * That conclusion, whether it relates to negligence, causation or any other factual matter, cannot be ignored. Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." Tennant v. Peoria & P. U. Ry. Co., supra, 321 U.S. at page 35, 64 S.Ct. at page 412, 88 L.Ed. 520. The scope of our review, therefore, is limited to the inquiry whether the plaintiff's allegation of negligence is supported by any substantial evidence and whether the jury could reasonably infer that such negligence was the proximate cause of the accident in question.

■ There is substantial evidence which would warrant the jury's finding that the

---

[1] Executive Order No. 55 Effective June 8, 1943.

"Section 7. *Outdoor Industrial Lights*

All lights used for out-of-door manufacturing, repair work, shipbuilding, necessary handling, or storage of raw or finished materials, for any type of construction work, in railroad yards or for raising of crops and poultry shall be permanently shielded so that all light is projected at least 30° below the horizontal. Lights which cannot be so controlled shall be extinguished."

defendant negligently failed to maintain the lighting system in that area of the engine house with which we are concerned. It appears that each side of Pit 48 was supplied with fixtures for 8 lights. When the dim-out regulations went into effect the two fixtures nearest the doors at the rear were disconnected and the wattage of others was reduced in compliance with the dim-out regulations. As a result there was no light at all at the doors to Pit 48. Floodlights used to light the area between the engine house and the turntable were also extinguished. Apart from the efforts of the defendant to comply with war-time regulations, however, the jury could infer from the testimony that with the exception of a few lights at the head of Pit 48, most of the 14 fixtures were not in working order owing to corrosion of the sockets or burned out bulbs. There was testimony to the effect that this condition had lasted for some time and had been the source of numerous complaints, that it had been called to the attention of the defendant by the Grievance Committee of the Union, and that the defendant had promised to take steps to remedy the situation but had taken no effective action by August 17.

The defendant relies upon its compliance with the dim-out regulations to explain the elimination of the yard floodlights and those lights at the engine house doors. We are not completely satisfied that the regulations required the elimination of all outside lighting. Section 7, relating to outside industrial lights, provides that all lights in railroad yards are to be permanently shielded so that all light is projected at least 30 degrees below the horizontal, and that all lights which cannot be so controlled are to be extinguished. Nothing in the record indicates that any attempt was made to comply with the regulations outside in the yard in any way other than by extinguishing lights. So far as the inside lights are concerned, with the exception of the lights right at the doors, compliance took the form of reducing wattage. There was substantial evidence as to the failure of these lights to function, from which the jury could infer that the defendant, apart from its efforts to comply with the dim-out regulations, was negligent in the maintenance of such lighting facilities as were permissible under the regulations.

■ The defendant's second point is that there was no causal connection between the condition of the lighting and the plaintiff's injuries. It contends that the hostler operating the locomotive backing into Pit 48 could never have seen the plaintiff because he sat on the engineer's seat and was looking back out of the side of the cab opposite to the side from which the plaintiff was approaching, and that he could see neither around nor over the tender which effectively confined his outlook to the left side of Pit 48.

The evidence[2] shows that the hostler was looking back as his locomotive made its way into Pit 48 and that he saw a body moving and the figure of a man standing up. As we view the case, however, it is not necessary to decide the question raised by the appellant whether or not it was physically possible for the hostler to see

---

[2] The hostler testified in part on cross-examination as follows:

"X-Q. 106. You were asked, 'Did you see anyone around anywhere?' and you said, did you not, 'Not before I hit him'. 'Q. Did you see him after you hit him? A. I saw something move and I put the brakes on.' That is so? A. That is right."

"X-Q. 107. 'Did he get up himself?' And your answer was 'Yes'. And that is the fact, isn't it? A. That is the fact."

"X-Q. 108. And you were asked: 'Did you see him standing up?' and your answer was 'Yes, afterwards'. A. That is right."

"X-Q. 109. And that is the fact?"

"Mr. Garland. Who is testifying?"

"Mr. Farmer. Well, I think my procedure is regular."

"X-Q. 110. You were asked, 'How was the lighting?' and your answer was, 'There was no light'. A. Yes."

"X-Q. 111. And that is in conformity with the facts? A. Yes."

"X-Q. 112. And you were asked 'It was pretty dark', and your answer was, 'Yes'. A. Yes."

"X-Q. 113. And that is the fact, isn't it? A. That is the fact."

"X-Q. 114. And then you were asked, 'Do you think it was so dark that you could not have seen a man sitting in the cab?' and your answer, 'I am very sure if I had seen him I would have stopped'. A. That is right, but he would not be in the cab."

"X-Q. 115. You were asked, 'You were sitting on the seat' and your answer is, 'Yes, on the seat', and that is the fact? A. Yes."

"X-Q. 116. And you were asked, 'With your head out looking back?' and your answer was 'Yes'? A. Yes."

154

around or over the tender and to decide if the jury could reasonably infer that had there been adequate lighting, the hostler would have been able to see the plaintiff in time to avoid the accident. Whether or not he was in a position to see the plaintiff, the evidence clearly warrants a finding that if there had been adequate lighting the plaintiff would have been able to see the backing engine in time to get out of the way. As was pointed out only the other day by the Supreme Court in Tiller v. Atlantic Coast Line R. R. Co., 1945, 323 U.S. 574, 65 S.Ct. 421, 423, "the diffused rays of a strong headlight, even though directly obscured from the front, might easily have spread themselves so that one standing within three car-lengths of the approaching locomotive would have been given warning of its presence, or at least so the jury might have found. The backward movement of cars on a dark night in an unlit yard was potentially perilous to those compelled to work in the yard. Tennant v. Peoria & P. U. Ry. Co., 321 U.S. 29, 33, 64 S.Ct. 409, 411 [88 L.Ed. 520]." The jury in bringing in a verdict for the defendant on count 2 and finding for the plaintiff on the first count decided that failure to keep the premises properly lighted was the proximate cause of the injury.

The judgment of the District Court is affirmed, with costs to the appellee.